FILED

APR 1 9 2019

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
LAFOLLETTE WELLNESS CENTER
THAT IS STORED ELECTRONICALLY
BY PREMISES CONTROLLED BY
PRACTICE FUSION

Case No. 3:19-MJ-2019

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Peter G. Wooden, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am an investigative law enforcement officer as a Special Agent of the Drug

Enforcement Administration ("DEA"). As such, I am empowered to conduct investigations of

and to make arrest for offenses enumerated on Titles 18 and 21 of the United States Code.

2.      This affidavit is offered in support of an application for a search warrant for

information associated with certain accounts that is stored at premises owned, maintained,

controlled, or operated by Practice Fusion, Inc., a cloud-based electronic health record provider,

headquartered at 731 Market St., #400, San Francisco, CA, 94103. The information to be

searched is described in Attachment A. Specifically, this affidavit is made is support of an

application for a search warrant pursuant to 18 U.S.C. § 2703(a), 2703(b)(1)(A) and

2703(c)(1)(A) to require Practice Fusion to disclose to the government records and other

information in its possession pertaining to the subscriber or customer associated with the

account, including contents of communication for the Dr. Henry BABENCO/LaFollette

Wellness Center account, located at Practice Fusion ("LWC Account"), for (1)evidence of a

crime, (2) images, messages, negotiations and sales of contraband, fruits of crime, or other items illegally possessed, and (3) property (including information) designed for use, intended for use, or used in committing a crime, described with greater particularity in Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3.    I have been a Special Agent with the DEA since September 2010, and am currently assigned to the Knoxville Resident Office ("KRO") in the Louisville Field Division. As such, I am charged with the duty of enforcing the Controlled Substances Act, and am authorized under 21 U.S.C. § 878 to carry firearms, executes warrants, make arrests for offenses against the United States of America, and to perform other law enforcement duties as authorized by law.

4.    I have attended the Basic Agent Training course at the DEA training academy in Quantico, Virginia and the Criminal Investigators Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, during which time I received specialized training regarding federal law, surveillance (physical and electronic), undercover operations, narcotics trafficking, and money laundering.

5.    By virtue of the position as a Special Agent, your Affiant is a federal law enforcement officer empowered to conduct investigations concerning the unlawful possession, possession with intent to distribute, and unlawful distribution of controlled substances, and associated conspiracies, and to make arrests for violations of Title 21, United States Code, Sections 841 and 846. As a Special Agent for the DEA, your Affiant has participated in multiple investigations involving the unlawful possession, manufacture, and distribution of controlled substances.

2

6. As a result of my training and experience, I am familiar with matters including, but not limited to, the means and methods used by persons and drug trafficking organizations to purchase, transport, store, and distribute drugs and to hide profits generated from those transactions.

7. During the course of these investigations, I have debriefed defendants, informants and witnesses who had personal knowledge regarding the narcotics trafficking, conducted physical surveillance, prepared affidavits for search and seizure warrants, participated in the execution of numerous search and seizure warrants, acted as an undercover agent, analyzed information received pursuant to administrative and federal grand jury subpoenas, analyzed evidence and information obtained from court-authorized pen register and trap and trace intercepts, phone tolls, financial documents, reviewed and transcribed recorded calls, and provided testimony.

## STATUTORY AUTHORITY

8. Under 21 U.S.C. § 841(a)(1), it is "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" unless otherwise authorized by law. In turn, conspiring with another to unlawfully distribute or dispense a controlled substance is a violation of 21 U.S.C. § 846.

9. Registered medical practitioners are permitted to issue prescriptions for controlled substances classified in four of the five schedules. *See* 21 U.S.C. § 829. These prescriptions must "be issued for the legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. 1306.04(a). A doctor or registered

3

practitioner who fails to act for a legitimate medical purpose in issuing prescriptions may be criminally charged for unlawful distribution. *United States v Johnston,* 2009 WL 806740, *4 (11th Cir. 2009); *United States v Merrill*, 513 F.3d 1293, 1301-02 (11th Cir. 2008); *United States v. Moore*, 423 U.S. 122, 124 (1975) (explaining that 21 U.S.C. § 841 applies to medical doctors when their activities fall outside the course of professional practice). Certain professionals, including doctors and pharmacists, are authorized to dispense controlled substances, *see* 21 C.F.R. § 1306.03-06, but only so long as they comply with federal law, including the regulations promulgated pursuant to 21 U.S.C. § 821.

10.     Under those regulations, "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04.

11.     The prescribing practitioner is responsible for the proper prescribing and dispensing of controlled substances. A prescription issued outside the usual course of professional treatment is not a valid prescription within the meaning and intent of the Controlled Substances Act. *See* 21 U.S.C. § 829. Any person knowingly issuing such a prescription shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

12.     Oxymorphone and oxycodone are Schedule II controlled substances in the narcotic drug class. Both oxycodone and oxymorphone are potent opioid agonists, used for the treatment of moderate to severe pain. Oxymorphone is approximately twice as potent as oxycodone on a milligram ("mg") to milligram basis. For example 30 mg of oxycodone would have a 45 mg morphine equivalent and 30 mg of oxymorphone would have a 90 mg morphine

4

equivalent. Based on training and experience, your Affiant knows that oxycodone and oxymorphone are desirable drugs of choice for illegitimate recreational use and are a commodity in the illicit market.

13.     Based on my training and experience, your Affiant is aware that pill mills attempt to convey the appearance of compliance with rules and regulations that govern the operation of certified pain clinics.

14.     As a result of my training and experience, I am familiar with matters including, but not limited to, the means and methods used by persons and drug trafficking organizations to purchase, transport, store, and distribute drugs and to hide profits generated from those transactions.

15.     I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation and from discussions with other law enforcement officers and Diversion Investigators. Such as, I am familiar with the *modus operandi* of DEA registrants who, independently or in concert with others, abuse their authority in a manner that controlled substances are ultimately diverted from the legitimate system of distribution to the illicit market. Often, such diversion occurs from an ostensibly legitimate business or businesses by complicit registrants and/or complicit employees of registered individuals or entities. In cases involving medical clinics, I know that these diversion schemes involve: the use of telecommunications devices for oral and/or typed messaging between or among participants of the scheme; the movement of U.S. Currency by cash transactions and electronic transfers between accounts; and fraudulent aesthetics to present a façade of a legitimate business. Such aesthetics may include: requesting and maintaining medical documentation and history, which may be outdated, false, or is not reviewed or used in

5

"treatment" decisions; maintaining paper or electronic patient files, which contain false reporting of client visits, diagnostic testing, and in which notes are often copied from previous visits; and dressing staff in medical scrubs, despite staff not being medically trained, certified, or licensed.

16.     Based on my experience, I am aware that medical offices and medical practitioners store medical and other records in the care of third party companies. These third party companies often provide online storage for these records, sometimes for a fee.  These companies can either provide services that are specific to the medical industry or are companies that provide generalized online storage (*e.g.*, Apply or Google).

17.     Based on my experience, I am aware that doctors who illegally prescribe or otherwise traffic in narcotics use online applications associated with their legitimate, or ostensibly legitimate, medical practice as a means of committing their crime.  These applications can also store evidence related to the crime.  By way of example, these can include (1) electronic health records for patients, which often contain evidence related to patients receiving an unusual amount of certain drugs; (2) point of sales transaction systems, that can allow law enforcement to trace suspicious transactions; (3) cloud storage provided by Apple and other vendors, which can store incriminating documents related to the practice (*e.g.*, contradictory records, drug ledgers, etc.); and (4) appointment and scheduling software, which can retain records of unusual appointments or lack of appointments for individuals still receiving drugs from the physician.

18.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  Not all of the facts of the investigation known to me are contained herein; rather, only those facts necessary to establish probable cause for the search described in Attachments A and B hereto have been included.

19.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Henry D. BABENCO, MD, Sharon NAYLOR, APRN, ALICIA TAYLOR, PA, each an employee or former employee of Lafollette Wellness Center ("LWC"), formerly located at 2212 Jacksboro Pike, Lafollette, TN 37766, along with others known and yet unknown, have operated a business in furtherance of a conspiracy to distribute Schedule II controlled substances (namely oxycodone and oxymorphone) and have committed violations of Title 21, United States Code, Sections 841(a)(1) and 846 by prescribing Schedule II controlled substances outside the scope of usual course of professional treatment and without a legitimate medical purpose. There is also probable cause to search the information described in Attachment A for evidence and instrumentalities of these crimes as further described in Attachment B.

## JURISDICTION

20.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## TARGET ACCOUNT TO BE SEARCHED

21.     This affidavit is made in support of an application for the issuance of a warrant to search the Target Account listed below. LWC is owned by Sharon NAYLOR; Henry D. BABENCO is the medical director for LWC. Attachment A includes a more detailed description of the Target Account along with information identifying proper service of process upon the corporation that controls the account.

- Dr. Henry BABENCO/LaFollette Wellness Center Account

7

## PROBABLE CAUSE

22.     I believe that, based upon the facts detailed in this affidavit, there is probable cause to believe that located in the Target Account described herein, there are fruits, evidence, and instrumentalities of criminal offenses against the United States, namely:

- Title 21, U.S.C., Section 841(a)(1) – that is, knowingly and intentionally distributing or possessing with intent to distribute a controlled substance;

- Title 21, U.S.C., Section 846 – conspiracy to distribute and/or possess with the intent to distribute controlled substances.

Specifically, based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 (Prohibited acts relating to controlled substances) and 846 (conspiracy to commit the same) have been committed by Dr. Henry BABENCO, Sharon NAYLOR, APRN, and Alicia TAYLOR, PA.

23.     The Target Account had an essential record-keeping component, of the LWC practice, specifically, patient files. Affiant learned from NAYLOR that LWC used a web-based patient management system called Practice Fusion to store patient records.

24.     On January 3, 2019, investigators sent a preservation of records request to Practice Fusion for the LWC records.

25.     Practice Fusion, an Allscripts company, is a cloud-based electronic health record (EHR) platform for doctors and patients. Practice Fusion provides health IT solutions to small, independent medical practices.

26.     I know that only individuals or business registered with the DEA can legally prescribe, distribute, possess, administer, and/or dispense a controlled substance, and that every

8

person who engages in or proposes to engage in such activity must obtain annually a registration issued by the Attorney General in accordance with the rules and regulations promulgated by him, as set forth in 21 U.S.C. § 822(a) and (b).

27.     BABENCO, NAYLOR and TAYLOR are registered with the DEA and can legally distribute, possess and prescribe controlled substances in compliance with 21 U.S.C. § 822(a) and (b).

28.     The DEA has determined certain medications are "controlled" based on their potential for addiction and abuse. The DEA assigns "schedules" to these medications according to their potential for abuse and addiction, with a controlled substance in Schedule II having the highest potential for abuse and addiction. Medications which are controlled are assigned to Schedules II, III, IV, and V.

29.     Oxycodone, a schedule II controlled substance, is a semi-synthetic narcotic analgesic that has historically been a popular drug of abuse among the narcotic abusing population. Oxycodone is marketed as OxyContin in controlled-release tablets in multiple milligram strengths. It is also marketed in combination products with aspirin such as Percodan or acetaminophen such as Percocet. OxyContin is intended to be prescribed by a licensed medical physician in an effort to manage a patient's severe and chronic pain stemming from a medical condition. It is one of the strongest pain medications approved for use in the United States. Percocet is used to relieve moderate to severe pain. Oxycodone is abused orally or intravenously. The tablets are crushed and sniffed or dissolved in water and injected. Others heat a tablet that has been placed on a piece of foil, and then inhale the vapors. Euphoria and feelings of relaxation are the most common effects of oxycodone on the brain, which explains its high potential for abuse.

9

30.    A combination of federal statutes and regulations control the lawful dispensing or distribution of Schedule II through V controlled substances.  The Sixth Circuit, along with other courts, has held that it is unlawful for a practitioner to distribute a Schedule II-V controlled substance if the doctor or pharmacist is acting outside the usual course of professional practice in violation of 21 U.S.C. § 841; *United States v. Johnson*, 71 F.3d 539, 542 (6th Cir. 1995).

31.    For a prescription for a controlled substance to be valid, it must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his/her professional practice, as required by 21 C.F.R. § 1306.4.

32.    Based on my training and experience, I know that patient files and other patient-related documents typically contain information concerning a patient's medical complaint(s); the objective findings of the doctor's examination of such patient, including medical history, tests run, and results thereof; the assessment, and plan of treatment.  Usually documentation exists in the medical file demonstrating whether a legitimate patient-physician relationship exists.  I further know that to maintain the integrity of the patient file and the information contained therein, and to otherwise provide a complete picture of the relationship between doctor and patient, it is necessary to review the entire patient file, including prescription(s) written, not just information pertaining to isolated visits.

33.    The Tennessee Department of Health, in compliance with the Controlled Substance Monitoring Act of 2002, established a database to monitor the dispensing of Schedule II, III, IV and V controlled substances.  The Controlled Substance Monitoring Database (CSMD) program is administered and maintained by the Board of Pharmacy and the CSMD committee.  The purpose of the CSMD is to monitor the prescribing and dispensing of controlled

substances. The CSMD is used by medical practitioners and pharmacists who are required to upload all prescriptions for Schedules II, III, IV and V controlled substances.

## INVESTIGATION

34.     Beginning in September 2017, investigators assigned to the DEA Knoxville Resident Office received information from the Tennessee Eighth Judicial Drug Task Force ("8th JDTF") that multiple patients of LWC were distributing controlled substances (oxycodone and oxymorphone) in the Campbell County area of East Tennessee. Agents with the 8th JDTF conducted four controlled purchases of oxymorphone from Carrie Green, a patient at LWC, between September 6, 2017 and September 21, 2017. In a further review of Green, agents learned through the CSMD that on August 31, 2017, TAYLOR prescribed Green 120 tablets of oxycodone HCL, 15 MG, and 90 extended release tablets of oxymorphone HCL, 15 MG, at LWC. During all four controlled purchases, Green sold oxymorphone HCL, 15 MG tablets. During the execution of a search warrant at Green's residence, law enforcement discovered prescription pills prescribed by TAYLOR.

35.     Several weeks later, on October 18, 2017, BABENCO contacted the Campbell County Sheriff's Office and requested to speak with law enforcement. Agents from the 8th JDTF called BABENCO back. BABENCO invited the agents to LWC to discuss the drug problem in Campbell County and the things BABENCO and other employees of LWC could do as medical providers to help stop the opioid problem. BABENCO told the agents that he owned a couple "pain clinics" and a "pain management recovery clinic." While laughing, BABENCO told the agents, "I get them hooked here and treat them there." At that point, agents with the 8th JDTF decided to activate a digital audio recording device.

11

36. BABENCO then told agents about his patient, Matthew Moser. BABENCO verbalized his belief that Moser was selling the medication that Moser was prescribed from LWC.

37. Based on the CSMD, BABENCO prescribed Moser 60 tablets of Oxycodone HCL, 20mg and 30 extended release tablets of oxymorphone HCL, 15mg, on September 28, 2017. Just a few weeks later, on October 18, 2017 (the same day BABENCO reached out to agents regarding Moser), BABENCO prescribed Moser 120 tablets of oxycodone HCL, 20mg, and 60 extended release tablets of oxymorphone HCL, 15mg.

38. The CSMD further revealed that, on November 21, 2017, BABENCO, despite previously verbalizing his suspicion that Moser was diverting the drugs, prescribed Moser 28 tablets of oxycodone HCL, 20 MG, and 15 extended release tablets of oxymorphone HCL, 15 MG. Just a week later, on November 28, 2017, BABENCO prescribed Moser 52 tablets of methadone HCL, 10 MG. Methadone – can be misused; Schedule II controlled substance.

39. During this recorded conversation with the agents, BABENCO also stated that he wanted to work with law enforcement, but did not want to put any of his staff in danger. BABENCO told the agents, "I mean I can take care of myself and I don't mind shooting up these fuckers. I can shoot well but, (laughing), but I don't want to put the staff in danger." Based on the context of the conversation, I believe BABENCO was referring to shooting patients.

40. Later in the recorded conversation with the agents, BABENCO said, "[i]t's really hard to kill somebody with pain pills if you take them the way you're supposed to. You know, I used to take care of people in hospice and I would give them enough morphine to kill an elephant. You can't kill people with morphine! It's really hard to kill people with opioids, because it really isn't poisonous. It slows down your breathing, but if they keep breathing, they

12

don't die!" BABENCO went on to say, "[y]ou know, I mean, you can't euthanize somebody with it. It's hard to do, you know? Even if they're begging to die 'cause they're hurting from metastatic lung cancer or whatever. You know, I have, my, my wife's mom, we brought her home to die in the house and hospice was giving her all kinds of stuff and, I mean, and I was encouraging them, and she just, she wanted to die, we wanted her to die, we wanted her to be comfortable. She wouldn't die! You know, like we couldn't kill her. She was a nice lady, I love my old mother-in-law, don't get me wrong, but you know."

      41.     Between March 1, 2018 and March 8, 2018, agents with the 8th JDTF conducted four controlled purchases of oxymorphone from Dennie Gibson, a patient at LWC. During one of the controlled purchases, Gibson distributed one oxycodone pill and one oxymorphone pill; during the other controlled purchases Gibson distributed only oxymorphone pills. Agents learned through the CSMD that on March 1, 2018, GIBSON was prescribed 60 tablets of oxycodone HCL, 30 mg, and 30 tablets of oxymorphone HCL, 15mg, by TAYLOR, at LWC. Based on the CSMD, Gibson went to LWC every 15 days.[1] During the controlled purchases, Gibson distributed varying dosage units of oxymorphone tablets, including dosages he was not prescribed.

      42.     In March 2018, agents with the 8th JDTF conducted an investigation drug distribution involving Randall S. Fraley. Agents conducted five controlled purchases of oxycodone from Fraley during the investigation. On March 13, 2018, agents conducted a search

---

[1] Based on my training and experience, I know that pain clinic patients who are prescribed only 15 days' worth of medication at a time are those patients who appear to be a high risk for diverting prescribed medication. For example, patients that failed urine analysis or pill counts. Furthermore, during an interview with Gregory Madron, agents learned that Gibson was seen every 15 days, because LWC staff learned that he had been arrested and charged with drug related charges.

warrant at Fraley's residence at 126 Indian Creek Road, Jacksboro, Tennessee. During the

execution of the search warrant, agents found $1,815, including some of the marked funds used

to conduct a controlled purchase. Agents also seized 25 oxymorphone tablets, 8 oxycodone

tablets and a Suboxone film. The CSMD indicated that Fraley had been a patient of BABENCO

and TAYLOR from October 2017 until the date LWC closed in late December 2018. Based on

the CSMD, Fraley received prescriptions for oxymorphone, oxycodone and gabapentin from

BABENCO and TAYLOR. The CSMD records show that on Jan. 30, 2018, Fraley was

prescribed 120 Oxycodone HCL, 20 mg tablets by BABENCO and on February 8, 2018, he was

prescribed 60 Oxymorphone HCL, 15 mg extended release tablets by BABENCO. On February

28, 2018, TAYLOR prescribed Fraley 120 oxycodone HCL 20 mg tablets and 60 oxymorphone

HCL 15 mg extended release tablets. On March 26, 2018, BABENCO prescribed Fraley a

prescription for 120 Oxycodone HCL, 20 mg tablets. About two weeks later, on April 10, 2018,

BABENCO prescribed Fraley 60 oxymorphone HCL, 15 mg extended release tablets  The

following month, on May 1, 2018, BABENCO prescribed Fraley 120 oxycodone HCL 20 mg

tablets and 60 oxymorphone HCL 15 mg extended release tablets. On May 31, 2018, TAYLOR

prescribed Fraley 120 oxycodone HCL 20 mg tablets and 60 oxymorphone HCL 15 mg extended

release tablets.

    43.    On April 12, 2018, agents interviewed Fraley regarding LWC. Fraley said he had

been going to LWC since late 2017. Fraley said prior to going to LWC he had been a patient at

Express Health Care ("EHC"),[2] a Suboxone treatment center for opioid addiction located in

---

[2] A search warrant was obtained in December 2018, to search the premises of EHC, in an unrelated case arising out of an investigation in the Eastern District of Kentucky.

Jacksboro, Tennessee. Fraley was prescribed Suboxone from prescribers at EHC on September 15, 2017.

44. Fraley stated his first visit at LWC cost $500.00. During his first visit, Fraley received a prescription for a two-week supply of hydrocodone. He stated his second appointment was set for two weeks later and he received a prescription for 120 count 15 milligram of Roxy (Roxycodone) and 60 count 15 milligram Opana (oxymorphone) at every appointment. I was able to confirm this based on records from the Tennessee CSMD. According to the CSMD, Fraley was prescribed 60 tablets of oxycodone HCL-Acetaminophen, 325 MG-10 mg, from BABENCO on October 24, 2017. Then on November 7, 2017, BABENCO prescribed FRALEY 120 tablets of oxycodone HCL, 20 MG, and 60 extended release tablets of oxymorphone HCL, 15 mg.

45. Fraley explained that BABENCO only prescribed Fraley hydrocodone during the first visit because Fraley still had Suboxone in his system on the urinalysis at his first visit. Records from the CSMD confirmed that on September 15, 2017, Fraley was prescribed Suboxone 8 MG-2 MG, FIL #90. Fraley believed the Suboxone was out of his system when he went back to LWC two weeks later. Fraley said he had discussed with BABENCO that he had previously been on Suboxone. BABENCO told Fraley that he (BABENCO) owned a Suboxone clinic in Kentucky. Fraley said he told BABENCO that he went to the Suboxone clinic because he had been taking "too much" pain medication and he wanted to cut it down. BABENCO told Fraley that he did not think Fraley had an addictive personality and prescribed Fraley 120 oxycodone 20 mg tablets and 60 oxymorphone 15 mg extended release tablets. Fraley admitted to law enforcement that that he has no need for oxymorphone.

46.     Based on my training and experience, I know that prescribing oxycodone and oxymorphone to a recovering addict who had recently been prescribed and taken Suboxone, is outside the scope of accepted professional medical practice.

47.     Fraley said he was seen by BABENCO approximately three times from the time he started going to LWC through April 2018. Fraley stated he was seen by a female, later identified as TAYLOR, all the other times. Fraley stated when he saw the female (TAYLOR), his visit would take a maximum of five minutes. He elaborated that the female (TAYLOR) would just ask him a few questions like, "how are you?" and "how is the medicine doing?" After a few questions like that he would be given a prescription for oxycodone and oxymorphone. That would end his visit. Fraley explained the whole visit would only take about 12 minutes after leaving the waiting room and going back for urinalysis, pill count, and blood pressure.

48.     Fraley said BABENCO acted strange during an appointment with Fraley in March 2018 (following the execution of the search warrant on Fraley's residence). Fraley explained that when the 8th JDTF conducted the search warrant at his residence, law enforcement seized his pain medication and bottle. Consequently, Fraley did not have his bottle or pain medication and could not produce these items to LWC for a pill count. According to Fraley, he did not tell LWC that his medication was seized by law enforcement. Fraley explained that LWC administered a urine analysis. Fraley did not have any pain medication in his system. Nonetheless, BABENCO prescribed Fraley oxycodone and oxymorphone on March 26, 2018 (same as he previously prescribed Fraley).

49.     At that same visit, Fraley said BABENCO questioned him as to why he did not have his pills and did not have any medication in his system. Fraley told BABENCO that he had

16

a rough month. According to Fraley, BABENCO counseled him about overtaking medication. Fraley also said that after he was counseled, BABENCO was provided Fraley with a prescription to re-fill his pain medications.

50.     Fraley also stated that during prior visits when LWC conducted pill counts, Fraley had on occasion been out of his Roxycodone (oxycodone) and he would place pills that had the same appearance in the bottle. Fraley noticed that the LWC staff would not inspect the actual pills; instead, they just looked down in the bottle and to see if it appeared there were still pills in the bottle.

51.     Fraley described LWC's office manager as a large male with a goatee. Fraley did not know his name, but stated that the office manager also acted as security for the clinic. Law enforcement identified Greg Madron as LWC's office manager during this time. Fraley recalled that he once pulled his truck into the parking lot of LWC to make a phone call. The office manager came out of the clinic and told Fraley he could not park in the clinic parking lot and told Fraley to leave the premises.

52.     Fraley also recalled one occasion when he was at LWC and a patient came in from Kentucky. Fraley said LWC staff told the Kentucky patient that they could no longer take patients from Kentucky; LWC turned the patient away.

53.     On March 19, 2018, DEA received a "suspicious order report" from H.D. Smith, a pharmaceutical supplier, regarding suspicious orders of oxycodone and oxymorphone by RIGGS DRUGS in LaFollette, Tennessee. A suspicious order, as defined in 21 CFR § 1301.74 (b), includes orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency. Pharmaceutical suppliers are required to issue suspicious order reports to DEA.

17

54.     The suspicious order report for December 2017, from H.D. Smith regarding Riggs

Drugs in LaFollette included, *inter alia*, the following red flags:

a.  RIGGS DRUGS dispensed 20,516 dosage units of oxycodone (for a total of 9,129

prescriptions) prescribed by Alicia TAYLOR, PA-C, Wendy Reed, NP,[3] and

Henry BABENCO, MD.  Each worked at LWC.

b.  RIGGS DRUGS dispensed 8,322 dosage units of oxymorphone (for a total of

9,129 prescriptions), prescribed by the above prescribers.

c.  The majority of controlled substance prescriptions written by the above-listed

prescribers were for a combination of oxycodone Instant Release (IR) with

oxymorphone Extended Release (ER).

d.  RIGGS DRUGS (LaFollette) dispensed 12,568 dosage units (121 prescriptions) of

oxycodone prescribed by TAYLOR.

e.  Pharmacy dispensed 5,776 dosage units (56 prescriptions) of oxycodone 30 mg

prescribed by TAYLOR.

f.  RIGGS DRUGS dispensed 4,918 dosage units of oxymorphone (77 prescriptions)

prescribed by TAYLOR.

g.  TAYLOR is the number one prescriber of oxycodone and oxymorphone to

patients using RIGGS DRUGS (LaFollette).

h.  RIGGS DRUGS dispensed 299 prescriptions written by TAYLOR.

i.  Pharmacy dispensed 221 controlled substance prescriptions written by TAYLOR.

---

[3] Wendy Reed worked at LWC for a very brief period of time, approximately October, 2017 through December 2017.  During an interview with Gregory Madron, general manager of LWC, Reed was dismissed when she asked BABENCO to treat her for pain management.

j.  74% of prescriptions written by TAYLOR and filled at RIGGS DRUG were for controlled substances.

k.  Majority of controlled substance prescriptions written by TAYLOR were for a combination of oxycodone IR (immediate release) with oxymorphone ER (extended release).

55.  Notably, during the relevant time period described herein, RIGGS DRUGS (LaFollette) was the number one purchaser of oxymorphone in the United States, according to Automated Reports and Consolidated Orders System ("ARCOS"). ARCOS is a DEA database which reports Schedule II and III narcotic controlled substances manufactured, received, and distributed by manufacturers and distributors. As of December 31, 2018, RIGGS DRUGS (Lafollette) ranked second in the United States for pharmacy purchases of oxymorphone for 2018.[4]

56.  In May 2018, agents with the 8th JDTF and DEA conducted an investigation involving Hattie Charlene Jones. Agents conducted three controlled purchases of oxymorphone during the investigation. On May 21, 2018, agents conducted a search warrant at Jones' residence at 282 Clawson Road, Lafollette, Tennessee and further executed consensual searches of three storage units. During the execution of those searches, agents seized $5,200 United States currency, 10 oxymorphone tablets, 84 oxycodone tablets, 87 Suboxone films, and 40 unknown pills. Jones admitted to agents that she had received oxymorphone and oxycodone from individuals in return for paying for these individuals' doctor visits and prescription copays.

---

[4] As of December 31, 2018, TERRY's Pharmacy Jacksboro was ranked number 13 and RIGGS DRUGS (Jacksboro) was ranked 15 in the United States for pharmacy purchases of oxymorphone.

Jones explained that many of the individuals she sponsored were patients at LWC and have prescriptions for both oxymorphone and oxycodone.

## Attempted Undercover Visit to LWC on June 20, 2018

57.     On June 20, 2018, investigators assigned to the Tactical Diversion Squad ("TDS") Nashville Division Office ("NDO") attempted to establish an undercover officer ("UC") as a patient at LWC. Our UC attempted an office visit as a walk-in patient. A female office staff member, wearing a nametag identifying herself as "Alicia," asked the UC if she had an appointment. The UC said no and Alicia instructed the UC to complete intake paperwork. Alicia handed the UC a piece of paper instructing her of the items LWC requires for the first time visit. Alicia told our UC that she would need to bring all the items back to the clinic and do a preapproval drug screen. Alicia stated that LWC did not accept insurance, but they take a copy of the insurance card to bill the urine analysis lab that does take insurance and they do pay on medication.

58.     The UC returned to the front desk with the paperwork. Alicia asked the UC if she had imaging records, and the UC replied she did not have any. Alicia stated LWC requires some kind of imaging records or a referral from a doctor.

59.     A male office staff member came to the window and asked if he could help the UC, and she replied that she was new to the area and did not have a primary care doctor or any imaging. The male office staff member explained that LWC will not usually take new patients without imaging because they have to see what it is that is wrong with them. The UC asked the male office staff member if she could be seen as a patient and be referred somewhere. The male office staff member stated that LWC does not conduct any primary care. The male office staff member stated the best thing he could tell the UC is to go see Dr. Narula Gurpreet (located at

20

2503 Jacksboro Pike, Jacksboro, TN 37757). The male office staff member told the UC, "[t]hat is probably going to be your best bet to get put into a place especially when you do not have any imaging because most pain management places won't take you unless you have something specifically saying that you have these things wrong with you. That's the only bad thing about it." The UC stated again, "[s]o there's no way to be seen here first or anything like that before?" The male office staff member stated, "[n]o they won't even consider you because you have to go through the approval process without some kind of something stating, you know, hey, I've got back issues or something like that." UC asked what doctor again, and he replied, "Dr. Narula." The UC asked where they might refer her to get imaging done and he stated usually to the hospital. The male office staff member stated that is the best bet and if the UC gets all the stuff (imaging), to come back with it and they will consider it.

60.     Later on the same date, the UC returned to LWC and presented a magnetic resonance imaging (MRI[5]) to the office staff member. An office staff member then escorted the UC to the back and instructed her to provide a urine specimen. The office staff member instructed the UC to place her belongings on top of a filing cabinet. The office staff member asked the UC if she has had a hysterectomy, and she replied no. The office staff member stated that every time the UC comes through the door she needs to go to the lab and put urine in any type of cup they give her so they can do a pregnancy test because state law requires it. The female office staff member stated the first urine screen will not be sent off to a lab, but the second one will be sent off. The office staff member stated the test was negative and

---

[5] An MRI is a medical imaging technique used in radiology to image the anatomy and the physiological process of the body in both health and disease. An MRI is a test that uses a magnetic field and pulses of radio wave energy to make pictures of organs and structures inside the body.

temperature was 90 degrees. She instructed the UC to wait in the lobby. Later Alicia stated they needed to review the UC's application, and they would call the UC once it is completed.

61.     The patient approval paperwork that Alicia provided the UC provided the following requirements:

       a.    A copy of a valid Tennessee driver's license without CDLS or a valid state of Tennessee ID;

       b.    A copy of insurance cards for lab and pharmacy purposes;

       c.    A paper copy of your current MRI, CT or any up to date X-Rays;

       d.    The last six months printouts of your pharmacy records.

       e.    A urine drug screen which will be performed once your paperwork has been submitted. If your drug screen does not match the medications that you have been prescribed you will not be considered a patient;

       f.    For patients brand new to our clinic: if approved there will be a $400.00 fee for service and $100.00 processing fee to be paid by debit, credit, or pre-paid card. Should we not be able to help you, the $400.00 fee for service will be refunded to you. The $100.00 processing fee is non-refundable;

       g.    Previous patients who have been approved to return to the clinic there will be a $400.00 fee for service with no processing fee; and

       h.    Every visit after the initial visit will be $400.00 per month on debit, credit, or prepaid card.

**<u>Attempted Undercover Visit to LWC on July 18, 2018</u>**

62.     On July 18, 2018, investigators sent the UC to LWC a second time in attempt to establish the UC as a patient of LWC. A female office staff member, wearing a name

tag identifying herself as "Alicia," came to the window at the front desk. The UC stated she was there a few weeks ago, and she was told that LWC needed more imaging done (X-rays). UC handed Alicia a CD containing an X-Ray of her lumbar spine from the Murfreesboro Medical Clinic in the name of her undercover identity. Alicia stated she would have to see if they would be able to play the CD on their computer. UC waited in the lobby. The UC stated she had the paperwork, and she handed it to Alicia. Alicia stated she would take the paperwork to the doctor and let him review it. Several minutes later, Alicia called the UC back up to the front desk and informed the UC that the doctor stated he could not see UC because the paperwork showed there was nothing wrong with UC's back.

### Interview of BABENCO on September 25, 2018

63.     On September 25, 2018, agents with the 8th JDTF met with BABENCO at his request. BABENCO had told agents that he wanted to discuss the opioid problem in Campbell County and a patient possibly sponsoring other patients at the clinic. BABENCO stated that he had come to believe over the last two years that most of the pills being diverted in Campbell County were coming from LWC. BABENCO told agents that they (LWC) were trying to crack down by doing urine tests and random pill counts. BABENCO told agents that he had received information from one of his patients that John York, another patient of LWC, sponsors multiple patients at multiple clinics and pays $400 for the visit and then takes the medicine to sell on the street. BABENCO's concern is when these patients are called in for a pill count, that YORK would have enough medication to cover the amount needed on that day. BABENCO believed that York also sponsors patients in Knoxville. BABENCO stated that they had suspicions because some of the patients were using the same credit card to pay for visits and he says they

23

put a stop to that. BABENCO said he did not know that names of the patients allegedly being sponsored by York.

64.     BABENCO stated that he is willing to bend the rules on HIPAA compliance, and wants to be able to call law enforcement when he believes he has someone that is a problem.

65.     BABENCO mentioned a lady that came in with a "pill bottle with a list in it that said take 90 and sell 20, as well as a roach (marijuana) in the bottom of it, I mean Jesus." This lady was discharged from the clinic, according to BABENCO.

66.     BABENCO said one of his patients had told him that there were two undercover patients in the clinic, but did not tell him who. BABENCO said that he did not press him for the information because either they were following the rules or they were not.

67.     BABENCO said that every year they were investigated by the Board of Health and this year it was more intense. BABENCO believed this was pursuant to a specific complaint from a patient that was discharged from another clinic (in Kentucky) for doctor shopping and having two aliases. This patient complained to the Kentucky Board of Medicine that BABENCO was raping her and fabricating electronic records (which he says is really hard to do). The Kentucky Board of Medicine found that the standard of care was met. Then she filed a malpractice lawsuit because he discharged her, as well as calling every hospital BABENCO had worked at. BABENCO believed that the intensity of the chart survey by the Board of Health was due to these complaints. BABENCO said that the state investigation was over and that the letter was sent out last week, and he should receive the letter this week letting them know the status.

68.     BABENCO mentioned two "fake patients" and said that he did not know if they were DEA, District Attorney, or the Health Department, but they treat everyone the same.

69.    BABENCO stated that LWC has patients from all over, Kentucky and the Virginia border.  He said that is really bad for their numbers because they are a big fish in a small pond.  He stated they are like number seven in the state as far as morphine equivalent prescriptions.  LWC prescribes oxycodone for short acting medicine and if they can afford the long acting medicine, oxymorphone.  BABENCO said that they were trying to find alternatives to oxymorphone due to the there being such a problem in the community.

70.    BABENCO said that he is from Paducah, Kentucky and usually flies his plane to the clinics rather than driving.  He said he had clinics in Lafollette, Seymour (Premier Health), Decherd, Tennessee, and Union City, Tennessee (Oasis Pain Tennessee).  BABENCO said that in Kentucky he does all addiction medicine and in Tennessee he does pain medicine and a little addiction medicine.  He said that he started doing a little Suboxone in Lafollette, Tennessee but the clinic was not set up for it with the staff and mental health.

71.    BABENCO believes that LWC has a bad reputation in the community even though they have an abnormally low death rate at his clinic.  He admitted to also helping patients manage their diabetes, high blood pressure and doing some primary care.  BABENCO said that they (LWC) have had no overdose deaths in over two years and that they are number seven out of 158 according to the Health Department.

72.    BABENCO stated that they are really lucky, or they are taking good care of their patients or everyone is diverting and no one is taking their medicine, so no one will overdose.  BABENCO stated that he had to be at the clinic 20 percent of the time, so if he did not show up on Tuesday, then they could not keep the clinic open.

25

## Suspected Drug-Related Death of Timothy Hutcheson

73.     On September 28, 2018, agents received information regarding the drug related

death of Timothy HUTCHESON, a patient of LWC.

74.     On approximately September 27, 2018, Dr. Darinka Mileusnic-Polchan, Chief

Medical Examiner at the Knox County Regional Forensic Center, contacted Knoxville Police

Department ("KPD") regarding the overdose death of Timothy Hutcheson. Hutcheson's death

was ruled acetyl fentanyl, fentanyl, morphine, oxycodone, and oxymorphone intoxication. Dr.

Mileusnic indicated there was concern about the oxycodone and morphine prescriptions from

BABENCO.

75.     On October 3, 2018, agents met with Dr. Mileusnic regarding Hutcheson. Dr.

Mileusnic reemphasized her concern about the oxycodone and morphine prescriptions from

BABENCO. Dr. Mileusnic said there were several red flags regarding the prescriptions. First,

she stated that during the autopsy there was anatomically no reason for Hutcheson to be

prescribed pain medication. Second, based on her review of Hutcheson's prescriptions on the

Tennessee CSMD, Hutcheson had previously been a patient at an opioid addiction treatment

facility. Dr. Mileusnic explained that Hutcheson's prior addiction treatment should have been a

red flag for BABENCO, and said there is no reason a person who participated in addiction

treatment should be placed back on long-term opioid pain treatment. Dr. Mileusnic also

indicated there was concern regarding the dosages of opioids Hutcheson was prescribed.

76.     Based on the CSMD records, Hutcheson regularly received prescriptions for 150

tablets of oxycodone HCL, 20 MG, and 60 extended release tablets of Morphine Sulfate, 15 MG,

from LWC (both BABENCO and TAYLOR provided prescriptions). The CSMD shows that

26

Hutcheson was a patient of Taylor and Babenco from November 15, 2017 and continued through June 18, 2018.

## Suspected Drug-Related Death of Stephanie RAMSEY

77.     Between October 29, 2018 and November 14, 2018, Kentucky State Police ("KSP") notified DEA agents of the suspected drug-related death of Stephanie RAMSEY in December 2017.  Based on prescription records from the Kentucky and Tennessee prescription drug monitoring programs, RAMSEY was a patient at LWC.

78.     On October 29, 2018, KSP received information regarding RAMSEY, who died in Whitley County, Kentucky from an overdose in December 2017.  KSP explained that the cause of death was overdose of oxymorphone.  KSP said it had found one instance, on September 26, 2016, in which BABENCO had prescribed RAMSEY oxymorphone through the Kentucky prescription monitoring program.

79.     Based on records from the Tennessee CSMD, Ramsey was regularly prescribed 120 tablets of oxycodone HCL, 30 MG, and 60 extended release tablets of oxymorphone HCL, 20 MG, beginning on June 14, 2017[6].  However on Ramsey's last prescription on November 13, 2017, BABENCO prescribed Ramsey 120 tablets of oxycodone HCL, 30 MG, and 90 extended release tablets of oxymorphone HCL, 15 MG.

80.     Ramsey's death certificate indicated the cause of death to be "toxic effects of oxymorphone" and "pulmonary Edema."  The Toxicology and Medical Examiner's report stated that the Medical Examiner determined that "the death in this 37-year-old, white female, Stephanie Ramsey, is due to toxic effects of oxymorphone.  Cardiomegaly is contributory factor

--------

[6] CSMD records were only obtained for the period of June 1, 2017 through December 31, 2017, for Ramsey.

27

in the death." The report explained that Cardiomegaly was a significant condition that contributed to death, but not resulting in the underlying cause. Ramsey's postmortem examination was performed at the Centralized Laboratory Facility, Frankfort, Kentucky on December 10, 2017, by William Ralston, M.D. The toxicology report provided the following results:

a. AMPHETAMINES – NEGATIVE

b. BARBITURATES – NEGATIVE

c. BENZODIAZEPINES - NEGATIVE

d. CANNABINOIDS - NEGATIVE

e. COCAINE/METABOLITES - NEGATIVE

f. FENTANYL - NEGATIVE

g. METHADONE/METABOLITE - NEGATIVE

h. OPIATES - POSITIVE

i. OXYMORPHONE - POSITIVE

j. OXYMORPHONE, QUANT - CONCENTRATION 13.9 ng/mL

k. PHENCYCLIDINE - NEGATIVE

l. PROPOXYPHENE/METABOLIT - NEGATIVE

m. ALCOHOL - NEGATIVE

n. METHANOL - NEGATIVE

o. ETHANOL - NEGATIVE

p. ACETONE - NEGATIVE

q. ISOPROPANOL - NEGATIVE

r. ANALGESICS - NEGATIVE

s.    ANTICONVULSANTS - NEGATIVE

t.    STIMULANTS - NEGATIVE

u.    TRAMADOL/METABOLITE – NEGATIVE

### Interview of Pharmacist Adam Gulley at Walmart Pharmacy

81.    On December 21, 2018, investigators interviewed Pharmacist Adam Gulley at the Wal-Mart Pharmacy located at 2824 Appalachian Highway, Jacksboro, Tennessee. Gulley stated he generally does not fill prescriptions from patients of LWC because the patients' Morphine Milligram Equivalent ("MME") figures are usually very high. Gulley stated that it was policy at Wal-Mart to flag any prescription with an MME over 90. Gulley stated they can fill prescriptions for MMEs over 90 but they must confirm that the patient has a serious condition, such as cancer, beforehand. Gulley stated that many patients from LWC have MMEs over 200 and even over 300. Gulley stated he turns those individuals away. Gulley explained that he turned away LWC patients because of the pattern he noticed. Gulley stated LWC patients consistently brought him prescriptions with high MMEs on a regular basis. Consequently, Gulley stopped filling them.

### Interview of Pharmacist Howie Irwin at Walgreens Pharmacy

82.    On December 21, 2018, investigators interviewed Pharmacist Howie Irwin at the Walgreen's Pharmacy located in LaFollette, Tennessee. Irwin stated that LWC seemed to have a cookie cutter or standard formula for prescribing. Irwin stated he has talked to Alicia TAYLOR when he had issues with a prescription from LWC. Irwin explained that BABENCO was more elusive. Irwin stated his contact with LWC is usually due to medications not being available.

83. Irwin stated that the pharmacy gets a significant number of patients from LWC and has had to turn them away at times. Irwin stated that Walgreen Co. stops accepting new pain patients if too many are coming to the pharmacy.

84. Irwin alleged that BABENCO flies in on his personal plane, asks standard questions of the patients, and gives the patients their prescriptions. Irwin estimated that approximately 60% of the LWC patients are shady and 40% are legitimate.

### Closing of LWC and Interview of Linda Parks

85. On January 2, 2019, 8th JDTF agents received a call from Fraley. During the call, Fraley informed the agents that LWC was no longer seeing patients. Fraley informed affiant that "Linda" was the only person working at LWC and giving patients a letter to take back to their primary care provider and a list of other clinics.

86. On January 2 and 3, 2019, DEA agents and 8th JDTF investigators responded to LWC and interviewed "Linda" identified as Linda Parks. Parks said the clinic was "officially closed." She explained that "they" had cleared everything out over the past weekend, December 29-30, 2018. Parks said she was there giving patients a printout containing a list of other pain management clinics and a letter that she hand wrote for the patients to give to their family doctors. Parks provided agents with a copy of the print-out containing the list of pain management clinics and a copy of the hand written letter. Parks stated that the last day patients were seen at LWC was December 20, 2018, although appointments were scheduled through January 11, 2019. Parks stated that the owner of LWC, Sharon NAYLOR, contacted Parks while she was on sick leave just before Christmas to inform Parks that LWC was closing and asked Parks to meet other employees at the clinic. Parks stated she met Sara (LNU) and a police

30

officer, along with three other employees. Parks stated the employees gave Parks their keys to the clinic.

87. Parks stated that NAYLOR told her BABENCO locked everyone out of the computers. Parks explained that only BABENCO had access to the electronic patient records at the time of this interview and Parks was unable to provide patients with their records.

88. Patients were waiting in line at the reception desk at the time the investigators arrived and throughout the interview. Parks was providing the patients with the printouts. An unknown male and female came into the clinic. The male appeared impaired or intoxicated and was stumbling when he walked with assistance of the female. Parks informed them that LWC was closed. The male got into the driver's seat of a red pickup truck, Tennessee license #6K0-8X5, and the female got in the passenger seat. Parks went outside to the vehicle to ask the male to wait in the parking lot while investigators called 911. When Parks returned to the reception area she began to hand out the packets quickly while telling the patients to "get out" and "get going" because law enforcement might be on the way. Parks told the investigators "the local police don't like our patients." The male driver waited for approximately one minute before quickly driving away.

89. Parks told investigators that representatives from Tennessee Premier (a clinic that offers chronic pain management, family medicine, and urgent care services, located at 3609 Outdoor Sportsman Pl., Suite 7, Kodak, Tennessee) were at a local hotel meeting with patients to schedule appointments. Parks stated there were between 800-1200 active patients at LWC at the time it closed. Parks stated that LWC management estimated it had only around 600 active patients, but Parks was confident that there were more active patients than management claimed.

31

**Telephonic Interview of Sharon NAYLOR Regarding the Closing of LWC**

90.    On January 3, 2019, at approximately 4:00 PM, Tom Lane with the Tennessee Health Related Boards/Office of Investigations made a recorded call to Sharon NAYLOR. During the conversation, NAYLOR made the following comments in regards to LWC.

      a.     "I'm Sharon NAYLOR, I owned it and I'm a Nurse Practitioner. He (BABENCO) was the Medical Director."

      b.     "The last patient day was the 20th (December) and we closed it the 31st."

      c.     "Dr. BABENCO is no longer qualified for my clinic. He has over-prescribed the stuff with the state nor the PA. So I just closed it wanting to be in compliance. He was supposed to do the monitoring thing and he wouldn't sign up for that so I didn't think we qualified any longer for a clinic."

      d.     "A lot of patients done got their records that had been seen and when we opened up yesterday we were blocked from Practice Fusion and it said, they just told us only Dr. Henry BABENCO had access to it."

      e.     "They wanted to know why I lost access and I said, 'You tell me because I paid for it.' So my attorney is working on that."

      f.     "You should go back there (LWC) and look at the back. Because I was back there Friday a week ago. I hadn't been there for a couple of months because I had heart surgery last year so I haven't been too active. And you can see that that staff trashed that place. If you could actually come in and saw it you would've closed it down yourself. You should go to the back."

g. "Dr. BABENCO had overprescribed and got a letter from the state. I myself hadn't written a prescription in two years. And he just had went wild and was sending my patients to his clinic in Seymour. And it just went wild and the staff went wild with him. It has been the strangest situation. And they had quit talking to me they would only talk him and then he was gonna buy. It sounds like something out of a soap opera. And I finally said 'No, I'm closing this. You cannot be doing this particularly with controlled substances. And the PA, Alicia TAYLOR, the physician's assistant, she also at his direction overprescribed and they had wrote her about her license."

h. "That's not all Mr. Lane. I mean he, you know, BABENCO has taken my patients up in airplanes and flew them to his house to work. And I'm like 'You cannot be doing this.'"

91.    Based on NAYLOR's statements, I believe LWC utilized the services of Practice Fusion to store its patient files. Practice Fusion is a web-based electronic health record ("EHR") company based in San Francisco, California. According to Practice Fusion's website, http://www.practicefusion.com, EHRs are digital records of health information. They contain all the information found in a paper chart plus more. EHRs include past medical history, vital signs, progress notes, diagnoses, medications, immunization dates, allergies, lab data and imaging reports (this patient information is described in further detail in Attachment B hereto). This patient information is likely to constitute evidence that the targets of the investigation were prescribing Schedule II narcotics outside the usual course of professional treatment.

33

92. In general, providers like Practice Fusion ask each of their subscribers to provide certain personal identifying information when registering for an account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, e-mail addresses, and, for paying subscribers, a means and source of payment (including any credit or bank account number). Providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account. In addition, providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

93. In some cases, account users will communicate directly with a provider about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

94. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant

34

to require Practice Fusion to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

95. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## CONCLUSION

96. Based on the forgoing, I request that the Court issue the proposed search warrant.

Respectfully submitted,

Peter G. Wooden
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on _____2 - 7_____, 2019

_____
UNITED STATES MAGISTRATE JUDGE

35